Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

In the Matter of the Search of
*(Briefly Describe the property to be searched or identify the person by name and address)*

Google Incorporated, 1600 Amphitheatre Parkway, Mountain View, California, 94043, Google account of Allen Mix; mix2019a@gmail.com

Case No. 22-8360 MB

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Northern _____ District of _____ California _____.
(identify the person or describe the property to be searched and give its location):

### As further described in Attachment A.

The person or property to be searched, described above, is believed to conceal (identify the person or describe the property to be seized):

### As set forth in Attachment B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

YOU ARE COMMANDED to execute this warrant on or before ___10-28-22___.
*(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10 p.m.
☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the United States Magistrate Judge on duty.

___in AZ.___.
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*   ☐ for 30 days *(not to exceed 30)*
☐ until, the facts justifying, the later specific date of _____.

Date and time issued: __10/14/22   11:47 AM__

_____
*Judge's signature*

City and State:  Phoenix, Arizona

Honorable John Z. Boyle, U.S. Magistrate Judge
*Printed name and title*

ATTACHMENT A
**Property to Be Searched**

This warrant applies to information associated with the following Google account belonging to:

1. Allen Mix:  mix2019a@gmail.com

which is stored at premises owned, maintained, controlled, or operated by Google, a web-based social network and electronics company, located at 1600 Amphitheatre Parkway, Mountain View, California, 94043.

**ATTACHMENT B**

**PARTICULAR THINGS TO BE SEIZED**

I.    **Information to be disclosed by Google, LLC**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, LLC, including any messages, records, files, logs, or information that have been deleted but are still available to Google, LLC, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Google, LLC is required to disclose the following information to the government for each user ID listed in Attachment A, for the period from January 1, 2022 through October 5, 2022:

(a)    All contact and personal identifying information for user Allen Mix; mix2019a@gmail.com, to include; full name, user identification number, birth date, gender, contact e-mail addresses, Google passwords, Google security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

(b)    All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

(c)     Google Drive information to include: documents, photos, notes, deleted items from the user's account;

(d)     All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken;

(e)     All chat logs for Google Hangouts, to include text and multimedia messages, voice call records, and video chat records for the account;

(f)     All Google Voice calls, voicemails, text messages, call logs, and contacts for the user ID;

(g)     Any unknown email accounts that are associated with the user ID, which are controlled by Google;

(h)     Google Photos information, to include: all photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, to include EXIF data;

(i)     All profile information; Web Apps and Activity information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Google user identification numbers; groups and networks of which the user is a member, including the groups' Google group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Google applications;

(j)     All "check ins" and other historical location information to include location information, Google Maps navigation history, and GPS coordinates;

(k)     All IP logs, including all records of the IP addresses that logged into the account;

(l)     Google Contacts information;

(m)    All records of Google searches performed by the account, to include browser search history and identification the browser used;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All records pertaining to communications between Google and any person regarding the user or the user's Google account, including contacts with support services and records of actions taken;

(q)     Related electronic devices, as identified by Google that the same User ID has logged onto using the Google account norris.tyshon@gmail.com; and

(r)     For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

The Provider is hereby ordered to disclose the above information to the government within 14 days of the issuance of this warrant.

**II.      Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 1153 and 1111 from January 1, 2022, to October 5, 2022, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Communications, posts, messages, videos and/or comments that would be evidence of the aforementioned crime;

(b) Evidence indicating the account owner's or user's state of mind as it relates to the crime under investigation;

(c) Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the account owner or user; and

(d) Records relating to who created, used, or communicated with the user ID, including records about their identities and whereabouts.

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| In the Matter of the Search of | |
|---|---|
| *(Briefly Describe the property to be searched or identify the person by name and address)* | Case No. 22 - 8360 MB |
| Google Incorporated, 1600 Amphitheatre Parkway, Mountain View, California, 94043, Google account of Allen Mix; mix2019a@gmail.com | |

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Det. Kyle Weeden, a federal law enforcement officer, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property (*identify the person or describe the property to be searched and give its location*):

### As further described in Attachment A.

Located in the Northern District of  California , there is now concealed (*identify the person or describe the property to be seized*):

### As set forth in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    X evidence of a crime;
    ☐ Contraband, fruits of crime, or other items illegally possessed;
    ☐ property designed for use, intended for use, or used in committing a crime;
    ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 18 U.S.C. §1111 | Murder |

The application is based on these facts:

### As set forth in Attachment C, incorporated herein by reference.

☒ Continued on the attached sheet.
☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is
    requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Raynette Logan *RP*
*Telephonically Sworn*

_____
*Applicant's Signature*

Kyle Weeden, Detective, Gila River Police Department
*Applicant's printed name and title*

Date issued:  10/14/22   11:47 AM

_____
*Judge's signature*

City and State:  Phoenix, Arizona

Hon John Z. Boyle, U.S. Magistrate Judge
*Printed name and title*

ATTACHMENT A
**Property to Be Searched**

This warrant applies to information associated with the following Google account belonging to:

1.  Allen Mix:  mix2019a@gmail.com

which is stored at premises owned, maintained, controlled, or operated by Google, a web-based social network and electronics company, located at 1600 Amphitheatre Parkway, Mountain View, California, 94043.

## ATTACHMENT B

## PARTICULAR THINGS TO BE SEIZED

**I.      Information to be disclosed by Google, LLC**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, LLC, including any messages, records, files, logs, or information that have been deleted but are still available to Google, LLC, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Google, LLC is required to disclose the following information to the government for each user ID listed in Attachment A, for the period from January 1, 2022 through October 5, 2022:

(a)      All contact and personal identifying information for user Allen Mix; mix2019a@gmail.com, to include; full name, user identification number, birth date, gender, contact e-mail addresses, Google passwords, Google security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

(b)      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

(c)     Google Drive information to include: documents, photos, notes, deleted items from the user's account;

(d)     All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken;

(e)     All chat logs for Google Hangouts, to include text and multimedia messages, voice call records, and video chat records for the account;

(f)     All Google Voice calls, voicemails, text messages, call logs, and contacts for the user ID;

(g)     Any unknown email accounts that are associated with the user ID, which are controlled by Google;

(h)     Google Photos information, to include: all photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, to include EXIF data;

(i)     All profile information; Web Apps and Activity information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Google user identification numbers; groups and networks of which the user is a member, including the groups' Google group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Google applications;

(j)     All "check ins" and other historical location information to include location information, Google Maps navigation history, and GPS coordinates;

(k)     All IP logs, including all records of the IP addresses that logged into the account;

(l)     Google Contacts information;

(m)     All records of Google searches performed by the account, to include browser search history and identification the browser used;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All records pertaining to communications between Google and any person regarding the user or the user's Google account, including contacts with support services and records of actions taken;

(q)     Related electronic devices, as identified by Google that the same User ID has logged onto using the Google account norris.tyshon@gmail.com; and

(r)     For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

The Provider is hereby ordered to disclose the above information to the government within 14 days of the issuance of this warrant.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 1153 and 1111 from January 1, 2022, to October 5, 2022, including, for each user ID identified on Attachment A, information pertaining to the following matters:

    (a) Communications, posts, messages, videos and/or comments that would be evidence of the aforementioned crime;

    (b) Evidence indicating the account owner's or user's state of mind as it relates to the crime under investigation;

    (c) Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the account owner or user; and

    (d) Records relating to who created, used, or communicated with the user ID, including records about their identities and whereabouts.

## ATTACHMENT C

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Kyle Weeden, a Criminal Investigator for the Gila River Police Department (GRPD), being duly sworn, depose and state as follows:

## INTRODUCTION

I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at Google Incorporated, 1600 Amphitheatre Parkway, Mountain View, California, 94043. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the Google account of Allen Mix; mix2019a@gmail.com, as more fully described in Attachment B.

## PRELIMINARY BACKGROUND INFORMATION

1.     Your affiant is a graduate of the Northern Arizona Regional Training Academy in Prescott, AZ. Your affiant has been employed with the GRPD since February 2018.  Your affiant is currently assigned to the GRPD Criminal Investigation Division Violent Crimes Unit and has primary investigative responsibility in Indian Country matters, to include, violent crimes, such as homicide and aggravated assaults.

2.     Your affiant has obtained a Special Law Enforcement Commission through the Bureau of Indian Affairs. As such, your affiant is a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and is thereby authorized to execute arrest and search warrants under the authority of the United States.

1

3.     I have been trained in various aspects of law enforcement, including searching and seizing of vehicles, electronic data and other property. In addition, I have been involved in multiple investigations in which vehicles, electronic data and miscellaneous property have been seized, searched, and forensically examined.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, officers, investigators and witnesses. This affidavit is intended to show merely there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. I have set forth only the facts I believe are necessary to establish probable cause to believe evidence of a violation of Title 18, United States Code, §§ 1153 and 1111 is located in the records of Google account of Allen Mix; mix2019a@gmail.com as described in Attachment A, for evidence of this crime as described in Attachment B.

5.     This Court has jurisdiction over these offenses under 18 U.S.C. § 1153 because the below-described events occurred on the Gila River Indian Community (GRIC), Adrian Sullivan (hereinafter SULLIVAN) and Allen Mix (hereinafter A.M.) are enrolled members of GRIC, a federally recognized tribe.

## DETAILS OF INVESTIGATION

6.     On August 17, 2022, at approximately 0030 hours, I was contacted by Gila River Police Department (GRPD) A/Sgt. J. Vargas. Sgt. Vargas directed me to respond to the Gila River Indian Community (GRIC) gun range, located at Casa Grande Highway and East Gun

2

1    Range Trail Sacaton, AZ (within the exterior boundaries of the Gila River Indian Community)

2    to assist with a possible homicide investigation.

3        7.      Upon arrival, I met with the initial responding GRPD officer, GRPD Officer B.

4    Kisto, who provided the following in summary:

5

6        8.      On August 17, 2022, at approximately 0011 hours, the Gila River Public Safety

7    Dispatch (Dispatch) received a 911 call from an anonymous reporting party (RP). The RP stated

8    there was an unresponsive male subject lying in the middle of the old Gila River Indian

9    Community Gun Range. Gila River Police Department (GRPD) Officers arrived on scene and

10   located the male subject, later identified as A.M. The officers checked A.M. for life signs but

11   were unable to locate any. Rigidity was also beginning to set in and lividity was observed on the

12   body. While Officers were checking for life signs, they located a small puncture wound,

13   consistent with a gunshot wound, near A.M.'s left armpit. Once the gunshot wound was located

14   and A.M. was confirmed deceased, the officers contacted the GRPD Investigative team,

15   consisting of GRPD Detectives and Crime Scene Specialists (CSS), to respond. GRPD Officers

16   were also able to determine an approximate location of the reporting party (RP.) After canvassing

17   the area, which was located approximately 2 to 3 miles from the incident location, GRPD

18

19   Officers were able to locate and identify the RP as J.L. J.L agreed to go with the officers to the

20

21   GRPD station until investigators could speak with her.

22        9.    Once I finished speaking with Officer Kisto, I stood by until the remaining

23

24   investigative team arrived on scene. Once the investigative team arrived, we conducted a

25   walkthrough of the crime scene. While walking through the crime scene, we observed A.M.

26   lying face up on the ground. Located near A.M. were shoe impressions leading to the body with

27

28

a zig zag formation and Adidas logo near the rear of the sole.  While examining the scene, I was advised by the Crime Scene Specialists they located a second set of shoe impressions they believed had a diamond pattern and were small sized shoes, similar to the average female shoe size. We also observed a small puncture wound near A.M.'s left armpit consistent with a gunshot wound from a small caliber handgun. Surrounding the body were multiple .22 caliber spent casings and 9mm spent casings. Based on my training and experience, the spent casings appeared have been on the ground for less than 48 hours. There were also tire impressions leading away from the body. No vehicles or other subjects were located in the area.

10.    During the course of the investigation, GRPD Detectives located and interviewed multiple subjects connected to A.M. Detective J. Hatley contacted E.C. E.C. told Det. Hatley that on August 16, 2022, at approximately 2300 hours (approximately 1 hour prior to when A.M. was found deceased), A.M. came to her residence.  A.M. asked E.C. if he could borrow her car, a faded Gold in color 1997 Nissan Maxima. E.C. allowed A.M. to borrow her car, and A.M. left with the car. As A.M. was leaving, A.M. told E.C. that he was going to try and make amends with two subjects named D.A. and M.M. E.C. advised that the license plate on the vehicle (Arizona License Plate ANY2562) was registered to J.J., which belonged to a different vehicle. E.C. provided a Vehicle Identification Number for the vehicle A.M., which is VIN JN1CA21DXVMS507577.  Detective Hatley also contacted A.M.'s parents, J.M. and A.M. They stated A.M had come to their house on August 16, 2022, between 2300 and 2330 hours, before leaving in a possible grey or silver car. Among those contacted at A.M.'s parents' house was his brother-in-law, J.D. J.D. informed Detective Hatley he had received a text message from

4

A.M. stating he needed help at approximately 2130 hours on August 16th. No further messages were received, and the message did not elaborate on what kind of help was needed.

11.   While the rest of the investigative team were conducting their interviews, A/Sgt. Vargas and I responded to the GRPD main station to interview J.L. While asking J.L. questions, she provided the following information.  J.L. stated she was in Casa Grande with her cousins at a liquor shop she referred to as "Saigon." J.L. stated the liquor shop was a Chinese shop located along Pinal Ave just past a restaurant called Vaqueros. Further investigation at a later time showed there was only one liquor store in the described area located near the intersection of N Pinal Ave and W Havasupai Dr in Casa Grande, AZ called "Stop By Convenience Store." J.L. stated they were buying alcohol to continue drinking. J.L. stated she and her cousins get together on the anniversary of J.L.'s sister's death to grieve. When asked, J.L. identified her cousins as J.A., A.A., and L.A. J.L. stated J.A. was the driver, and they had driven to Saigon in J.A.'s vehicle.

12.   After getting more alcohol from the store, the group got back in the vehicle to drive to Sacaton. During the drive, J.L. stated she got into an argument with her cousins and got out of the vehicle. J.L. stated the next thing she remembered was walking along the highway, along the overpass crossing the I-10, when a white small car stopped by her. J.L. stated the vehicle was occupied by only a male driver.

13.   When the vehicle stopped next to J.L., the driver asked J.L. where she was going. J.L. told the driver she was going to her home in Sacaton. The driver asked J.L. if she wanted a ride into Sacaton. J.L. stated she did not know the driver and normally would say no. However, this time J.L. accepted his offer and got into the vehicle.  During the drive J.L. stated she and the

driver remained silent and did not talk. While the male subject was driving her to Sacaton, J.L. told the driver she needed to urinate. The driver pulled onto E Gun Range Trail and drove toward the old gun range. The road leading to the gun range was lined with numerous desert bushes and trees. The road continued toward the mountain for approximately 150 yards before reaching the gun range.

14.     When the driver stopped by the gun range, J.L. stepped out of the vehicle and saw the male subject lying on the ground in the gun range. J.L. stated she never moved away from the vehicle once she placed her feet on the ground. J.L. stated she thought he looked like her brother, Jaime Lugo, but the driver told her to get back in the car or get left behind. J.L. stated they never approached the subject or passed the fence line into the gun range. J.L. got back into the vehicle when the driver stated he was leaving. We asked J.L. if she thought the subject lying on the ground was her brother, why didn't she go check on him. J.L. stated she did not want to get involved and wanted to leave. We asked J.L. if she was close to her brother, and she stated yes. We provided J.L. with a rough diagram of the gun range to include the road leading to the gun range, the fence surrounding the gun range and the gate in the fence. We asked J.L. to draw the location the vehicle was parked and where she walked. J.L. drew a square to indicate the vehicle and initially stated the car parked by a tree near the gate and was perpendicular to the gate. J.L. later corrected herself and stated the vehicle was actually slanted away from the gate and indicated the direction it was facing on the diagram. According to J.L.'s sketch the vehicle was slanted at approximately 45 degrees from the gate.

15.     We also asked J.L. why she didn't call 911 the moment she saw him. J.L. stated she wanted to call 911, however the driver told her to wait until he dropped her off. J.L. stated the driver dropped her off at her boyfriend's house and left. J.L. stated she contacted her boyfriend, A.J., at the house and told him what happened. A.J told J.L. that she needed to call 911 so J.L. called 911.

16.     After taking J.L.'s statement and completing the interview with J.L., we asked her if she had her phone with her the entire time. J.L. stated yes and pulled out a Black smart phone with a cracked screen. J.L. identified the phone as hers and stated it was the same one she was carrying during the incident. I also asked J.L. if I could look at the bottom of her shoes. The shoes J.L. were wearing were a pair of black Adidas shoes. The bottom of the shoes had diamond pattern tread. I asked J.L. if we could take her shoes as potential evidence, and she let us take her shoes.  We also explained to J.L. that we believed her cell phone may contain data pertinent to the investigation, including tracking information to show the path she took. We asked J.L. if she would allow us to hold the phone until the data could be extracted. J.L. stated no. A tribal search warrant was drafted requesting permission to search J.L.'s person and seize any cellular devices in her possession. GRIC Judge Janice Breckenridge granted the search warrant. Once the search warrant was granted, a copy was provided to J.L. Once J.L. read through the search warrant, J.L. provided us with the phone, a Black in color Samsung Galaxy smartphone IMEI 353955219473483, without further incident. Both the shoes and phone were secured in the GRPD Evidence Department.

17.     On August 17, 2022, the Pinal County Medical Office (M.E.) conducted an autopsy of A.M. During the autopsy, Dr. Hu confirmed A.M.'s manner of death was homicide due to a single gunshot wound. Dr. Hu also confirmed A.M. was likely shot with a small caliber handgun that entered through his left arm pit and perforated multiple organs causing massive internal bleeding.

18.     On August 17, 2022, I conducted a follow up interview to verify J.L.'s statement. During the follow up investigation, I was able to contact J.L.'s cousins J.A. and L.A. Both subjects denied being with J.L. on August 16th. J.A. stated she was at her home all day due to being under quarantine for medical reasons, and J.L. stated she was working during those hours. Both subjects also advised it had been approximately one (1) year since they had last seen J.L.

19.     While conducting my interviews, GRPD Detective J. Greeley and Detective P. Cuellar conducted follow up investigations to locate the "Saigon" store. The detectives were able to locate Saigon, and identified the store as the "Stop By Convenience Store", located at 10175 N Pinal Ave Casa Grande, AZ. Detective Greeley and Detective Cuellar stated they had contacted the store owners as well. The store owners stated on August 16, 2022, they had to close the store early, at 2100 hours, due to a family emergency.

20.     During the course of the investigation, GRPD detectives issued an attempt to locate notice to the National Crime Information Center (NCIC) database for the 1997 Nissan, due to the vehicle still being outstanding. On August 18, 2022, at approximately 1600 hours, GRPD dispatch received a call from a subject who identified herself as D.M., who said she observed the 1997 Nissan driving along the Sacaton roads. Officers searched the area and located the reported vehicle. Officers confirmed the vehicle was the vehicle A.M. borrowed the night of

his death by the AZ license plate on the vehicle and matching description. GRPD Officers C. Ward, D. De La Rosa and Commander M. Duarte followed the vehicle until it came to a stop at a house in Sacaton, AZ (within the exterior boundaries of the Gila River Indian Community). Through past records and calls for service, the officers were able to confirm the house was the residence of D.A. Once the vehicle was stopped, officers contacted a male subject in the driver seat, identified as SULLIVAN. SULLIVAN was confirmed as the sole occupant of the vehicle and detained. Detective Greeley and I responded to the scene to continue the investigation. The vehicle was seized as evidence and transported to the GRPD evidence impound lot, where it remains. SULLIVAN was transported to the GRPD station for further questioning by detectives.

21.    Prior to going to the GRPD station, Detective Greeley and I contacted and interviewed D.A., who was living at the residence where SULLIVAN was located.  D.A. provided her date of birth as well as a cell phone number.  D.A. stated that her phone was missing and that she believed a friend may have walked off with it by accident.  I provided the Miranda Warnings to D.A. utilizing a department issued Miranda Warnings card. After reading the card, I asked D.A. if she understood her rights, and she stated yes.

22.    I explained to D.A. why we wanted to talk to her and asked her where she was Tuesday, August 16th, between 2100 hours and midnight. D.A. stated she was at her residence the whole time. I asked D.A. to confirm if she was at the house the whole time. D.A. stated she was with one of her friends, Paul, at the "Amphitheatre." Based upon my experience working in the community, "Amphitheater" refers to an outdoor theatre located directly behind the Boys and Girls Club, located at 80 E Seed Farm Rd Sacaton, AZ. D.A. stated she met her friend at the Amphitheater at approximately 2345 hours. D.A. stated she utilized the Facebook Inc. social

media platform "Messenger" app to communicate with Paul. During the interview, D.A. stated the Messenger app was her main mode of communication.

23.     D.A. stated her profile ID was "DVN L Antone." D.A. stated she messaged Paul first and asked him if he wanted to hang out at the Amphitheater because she had something she needed to talk to him about.  D.A. initially stated she was alone in the house, however, she quickly amended her statement and advised M.M. was at the house with D.A.'s mother and D.A.'s children.

24.     D.A. explained she left her house at approximately 2345 hours. When she got to the Amphitheater, she looked at her phone and noticed it was approximately 0002. D.A. stated she returned to the house at approximately 0400 hours. I asked D.A. if the phone she checked was the same phone that went missing. D.A. stated yes.  D.A. stated Paul had left in the morning, and she noticed her phone was missing. D.A. stated Paul had a similar phone and probably grabbed hers by mistake. D.A. initially stated she did not bother asking him for the phone. However, she amended her statement and advised she did message Paul about the phone, and he denied taking it.

25.     D.A. stated they were at the Amphitheater for 10-15 minutes before walking over to her brother's girlfriend's house. When they arrived, no one answered the door, so they walked back to the Amphitheater. When they got back to the Amphitheater, they saw another male subject there. D.A. stated she recognized the subject as her late boyfriend's best friend, D.M.  I asked D.A. if they spent the rest of the time talking at the amphitheater. D.A. stated they were there for approximately 15 minutes before making their way back to D.A.'s house. D.A. stated Paul left later that morning, which was when she noticed her phone was missing. During the

interview, D.A. also stated she had a second phone that was out of service.

26.     D.A. confirmed she had a second phone, but that it was used only for Wi-Fi connection since it did not have a sim card. D.A. stated it was a smartphone she utilized to access the internet and Facebook messenger through Wi-Fi connections. D.A. also advised the phone was a Motorola smartphone and did not have an associated phone number due to no sim card being connected.

27.     D.A. stated they returned to the house at approximately 0430 hours. D.A. stated David left the house at approximately 0500 hours, and Paul left at approximately 0700 hours. I returned the topic to when D.A. was communicating with Paul. D.A. stated she would communicate with Paul through the Facebook Messenger app. D.A. stated she believed Paul's Facebook profile was either "Anthony Paul" or "Anthony Paul Jr." I asked D.A. if her profile was connected to Paul's profile as a "Friend." D.A. initially stated no, but quickly corrected her statement and advised Paul had sent her a "Friend Request" that she accepted.

28.     D.A. stated she recently met A.M. a few months back when M.M. had brought him over to the house a couple times. Since then, D.A. stated A.M. "comes around every now and then." D.A. initially stated A.M. would come to hang out when M.M. was at the house. However, D.A. amended her statement and advised A.M. would contact her if he could not get a hold of M.M. to hang out. D.A. stated that all three of them (D.A., A.M. and M.M.) were friends/acquaintances. D.A. stated that A.M. had been around a lot lately. D.A. stated A.M. was at her house three nights ago. It should be noted the day we contacted D.A. was on August 19th, which would have made "three nights ago" August 16th, the date of the original incident.

29.     D.A. stated that three nights prior, A.M. accused her of being jealous over his relationship with M.M. D.A. stated she told him he was wrong, and she did not see him as relationship material. I asked D.A. if it was Tuesday morning the argument took place. D.A. stated "Mm, that early morning." D.A. stated A.M. had left that early morning at approximately 0400 hours.

30.     D.A. changed her statement and stated the day A.M. left the house at approximately 0400 hours was Monday morning.  D.A. stated on either Saturday (August 13th) or Sunday (August 14th), A.M. gave D.A. and M.M. a ride to the Fry's grocery store, located on Riggs Rd in Chandler, AZ, between 1900 hours and 2000 hours. D.A. stated A.M. was driving his mother's vehicle, a black Dodge sedan. After they finished shopping, D.A. stated all three returned to her house at approximately 2200 hours. A.M. dropped off M.M. and D.A. and went back to his parent's house to return their vehicle. After approximately 20-30 minutes, A.M. returned to the house and stayed at her house until Monday morning when the argument happened.

31.     During the argument, D.A. stated they were outside the house when A.M. gave D.A. his phone and told her to read a message on the phone. D.A. stated she did not look at the message because it was none of her business and threw the phone on the ground. A.M. got upset and responded by telling D.A. she didn't have to be so jealous. D.A. asked A.M. what he was talking about, and A.M. stated "of M.M. and me." D.A. stated she accused A.M. of making up stories in his head and went inside. D.A. stated they continued arguing inside the house. The argument continued until 0400 hours Monday morning when A.M. left D.A.'s house.

32.     D.A. stated another friend, SULLIVAN, came over to her house later that same day and showed D.A. multiple text messages sent to SULLIVAN from A.M. In the messages, A.M. told SULLIVAN that D.A. was hanging out with Paul and they did not know where D.A. was. A.M. told SULLIVAN he was worried about D.A. because she did not have her phone with her. D.A. stated on Tuesday that A.M. attempted to message her. D.A. sent A.M. the screen shots she got from SULLIVAN and told A.M. not to contact her again. A.M. responded to D.A. and told her he thought they were in a relationship because A.M. would flirt with D.A. and she would flirt back. D.A. stated she ended the conversation and told A.M. not to contact her again.

33.     D.A. stated after telling A.M. not to contact her anymore she realized her wallet was missing. D.A. stated she figured out the wallet must have been left in A.M's vehicle when he took them to the store. D.A. stated she messaged A.M. and asked him if the wallet was still in his mother's car. A.M. messaged D.A. and told her the wallet was being held by his aunt, AnnaM. D.A. stated that on Tuesday morning, August 16th, she went with M.M. to AnnaM.'s house to retrieve the wallet. D.A. stated they went to the Aunt's house between 0900 and 1000 hours. D.A. stated they went to the house and contacted AnnaM, who provided her with the wallet. D.A. stated they left the moment they got the wallet. D.A. stated she did not see A.M., but she did message him to tell him she got the wallet. D.A. stated A.M. tried messaging her again. D.A. stated she had not had any contact with A.M. since.

34.     D.A. stated she was using "Messenger" to send and receive messages through her phone from SULLIVAN and A.M.  In my training and experience, I recognized 'Messenger' as a texting app utilized through the social media platform Facebook Inc. D.A.

stated she had screen shots of the messages on her secondary cell phone.  D.A. also stated A.M. sent her multiple texts through "Messenger" on Tuesday attempting to apologize for the argument. D.A. stated the last message she received from A.M. was a simple "yo" on Tuesday evening at approximately 2100 hours.

35.      D.A. stated she just wanted me to be aware of all the lies A.M. had tried to tell SULLIVAN. D.A. stated it was all on the messages she took a screen shot of. I asked D.A. where the screenshots were, and she stated, "On the phone I have."

36.      I asked D.A. if we could seize her phone as evidence to download the screenshots and any relevant data. D.A. stated yes. Once the interview was completed, D.A. went back into the house and returned with a black smartphone. D.A. provided us with the phone, a black in color Motorola smartphone IMEI 351394590662369, and she advised it was the phone she used to send and receive messages. I asked D.A. if the phone required a password to access and she stated no. I secured the phone in my patrol unit and later secured the phone in the GRPD Evidence lockers.

37.      After concluding the interview, Detective Greeley and I went to the GRPD station to interview SULLIVAN. Upon arrival to the GRPD station, Det. Greeley and I went to the interview room and contacted the male subject who was driving the gold Nissan Maxima sedan. The male subject identified himself as SULLIVAN.   We read SULLIVAN his Miranda Warnings utilizing a department issued Miranda Warnings card. SULLIVAN advised that he understood his rights.

38.      SULLIVAN stated he couldn't remember where he was on Tuesday evening, August 16, 2022.  When asked about the vehicle he was arrested in SULLIVAN stated a "homie"

gave it to him. I asked SULLIVAN for the name of his "homie." SULLIVAN stated he did not want to give out any names. SULLIVAN said he couldn't remember when he had been given the vehicle. SULLIVAN stated he smokes Meth (methamphetamine) on a continuous basis which causes memory issues.

39.     SULLIVAN stated A.M. came to D.A.'s house and picked him up. SULLIVAN stated he was in the front passenger seat while A.M. was in the driver seat. SULLIVAN stated they stopped in the mountains, but he was unable to advise which mountain they were stopped near. SULLIVAN stated he only remembered they were smoking when he looked up at the moon and thought, "the moon looked pretty nice," before closing his eyes and waking up in the Sacaton East Cemetery, located approximately 1 mile north of the incident location. When SULLIVAN woke up in the cemetery he was in the driver seat of the vehicle Allen was driving, the gold Nissan Maxima, and Allen was no longer with him.

40.   During the interview SULLIVAN stated he had a gun with him prior to stopping at the mountain. When Sullivan woke up at the cemetery he was alone in the car and his gun was missing.   SULLIVAN went on to describe the gun as a "peashooter." SULLIVAN stated the gun fired live ammunition, but only "small little ones." While speaking with SULLIVAN about the location of the gun, SULLIVAN became silent before muttering, "I'm sorry, Steph. I'm sorry, D.A. I'm sorry, Leah. Sorry, Lex. Sorry, Dad. Sorry, everybody. I fucked up again..." Once the interview was complete SULLIVAN was taken into custody and booked into the GRIC Department of Rehabilitation and Supervision (DRS) on one count of homicide.

41.     While going through the booking process SULLIVAN was provided a new set of clothes and slippers. The clothes he was currently wearing were placed in a temporary storage

at the DRS, with the exception of his shoes. Once the shoes were removed I noticed they were a pair of black Adidas shoes. I examined the soles of the shoes and noticed the pattern on the shoes matched the shoe impressions located near A.M.'s body. The size of the shoes also appeared to be the same. I seized the shoes as evidence. When SULLIVAN was originally arrested he was located in possession of a black Samsung smart phone, IMEI 357388863748636 which he confirmed was his. While booking SULLIVAN into DRS he asked if he could retrieve a phone number from his phone. SULLIVAN was provided the phone. While I was watching SULLIVAN, I observed prior to unlocking the phone, he tapped on the lock screen and pulled up a Facebook messenger app icon. SULLIVAN then quickly moved the icon to a delete button and deleted the Messenger App from his phone before I could take the phone back. The phone was seized as evidence. Both the phone and shoes were later secured in the GRPD evidence department.

42.     On August 24, 2022, I received an email from the DRS Chief Administrator Ron Lopez. In the email Director Lopez advised he received a memo from one of the Correction Officers, Ofc. Jose Ponce, concerning comments SULLIVAN made to Ofc. Ponce. On August 22, 2022, Ofc. Ponce was conducting a classification interview with SULLIVAN. During the interview, SULLIVAN informed Ofc. Ponce he was told by D.A. that A.M. had recently raped her in front of her children. SULLIVAN stated he drove to the Sacaton fire range (gun range) and got into a verbal altercation with A.M. over the rape allegations. While struggling with A.M., SULLIVAN stated he pulled out a "small piece" from his pocket and shot A.M. in the armpit.

43.     On September 27, 2022, GRPD Detective J. Hatley and I conducted a follow up investigation at a home on N Sparrow Cir., Coolidge, AZ (within the exterior

boundaries of the Gila River Indian Community).  Upon arrival we made contact with a female subject who identified herself as A.M's mother, AnnaMa. While speaking with Anna, she stated she received an email concerning A.M.'s Gmail account. Anna stated A.M. used to use her email as a recovery email to get access to his accounts. Anna stated she received an email the previous day, September 26, stating someone was trying to reset A.M.'s Gmail account password. Anna stated the email associated with the account was mix2019a@gmail.com. Anna stated the email was A.M.'s primary email used for communication and logging into social media accounts.

## TECHNICAL BACKGROUND

44.    In my training and experience, I have learned that cellular service providers are companies that provide cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site

17

1   data is typically less precise than E-911 Phase II data or GPS data.

2      45.   Based on my training and experience, I know that the Service Provider can collect

3   cell-site data about the location of cell phones.  I also know that wireless providers such as the

4   Service Provider typically collect and retain cell-site data pertaining to cellular phones to which

5   they provide service in their normal course of business in order to use this information for various

6   business-related purposes.

7

8      46.   Based on my training and experience, I know that wireless providers such as the

9   Service Provider typically collect and retain information about their subscribers in their normal

10  course of business.   This information can include basic personal information about the

11  subscriber, such as name and address, and the method(s) of payment (such as credit card account

12  number) provided by the subscriber to pay for wireless telephone service.  I also know that

13  wireless providers such as the Service Provider typically collect and retain information about

14  their subscribers' use of the wireless service, such as records about calls or other communications

15  sent or received by a particular phone and other transactional records, in their normal course of

16  business. In my training and experience, this information may constitute evidence of the crimes

17  under investigation because the information can be used to identify a cell phone user or users

18  and may assist in the identification of co-conspirators and/or victims.

19

20     47.   Additionally, in my training and experience, I have learned that electronic

21  communications, including retrieved and unretrieved voicemail, text, and multimedia messages

22  for its subscribers may be located on the computers of the Service Provider.  Further, I am aware

23  that computers owned or operated by the Service Provider contain information and other stored

24  electronic communications belonging to unrelated third parties.

18

48.     Wireless phone providers such as the Service Provider often provide their subscribers with voicemail services.  In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail.  If the subscriber does not delete the message, the message may remain in the system of Verizon Wireless for weeks or months.

49.     Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers.  This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS") and is often referred to generically as "text messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by the Service Provider for short periods incident to and following their transmission.  In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

50.     Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages.  Providers may

also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

51.    Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages.  A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

52.    A Google subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google.  In my training and experience, evidence of who was using an account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

53.    In my training and experience, service providers generally ask their subscribers to provide certain personal identifying information when registering for an account.  Such

information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

54.     In my training and experience, service providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, service providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

55.     This application seeks a warrant to search all responsive records and information under the control of Google, a provider subject to the jurisdiction of this court, regardless of where Google has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications

and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Google's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

56. As explained herein, information stored in connection with a subscriber's account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with a subscriber's account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time

57. Last, stored electronic data may provide relevant insight into the subscriber's state of mind as it relates to the offense under investigation. For example, information in the account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

58.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require the Service Provider to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.   Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.  Because the warrant will be provided to the Service Provider, which will provide the information to law enforcement, I respectfully request permission for agents to examine the information provided at any time of the day or night.

## CONCLUSION

59.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence described in Attachment B, in support of an investigation related to Murder, a violation of 18 U.S.C. §§1153 and 1111, will be found in the Google Gmail Account, which is owned by Google, Inc., of Allen Mix; mix2019a@gmail.com, as described in Attachment A.  This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).]

60.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _10-14-22_

_____
Detective Kyle Weeden #1448
Gila River Police Department

Telephonically subscribed and sworn to before me this _14th_ day of _OCT_, 2022.

_____
HONORABLE JOHN Z. BOYLE
United States Magistrate Judge
District of Arizona

24